**NOT RECOMMENDED FOR PUBLICATION**
File Name: 19a0022n.06

No. 18-5658

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

JAMES A. JACKSON, )
)
    Plaintiff-Appellant, )
)
    v. )
)
THOMAS LAWSON, in his individual capacity, )
)
    Defendant-Appellee. )
)

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF KENTUCKY

BEFORE: SUTTON, GRIFFIN, and LARSEN, Circuit Judges.

GRIFFIN, Circuit Judge.

Plaintiff appeals from an order granting summary judgment in defendant police officer's favor in this § 1983 wrongful detention case. We affirm.

I.

On December 16, 2016, Louisville Metro Police Officer Thomas Lawson responded to a report of a suspicious person in an alley. There, Lawson discovered plaintiff James Jackson with an uncapped needle loaded with heroin. Lawson learned Jackson's name and social security number, and ran this information through law enforcement databases to search for other active warrants out on Jackson. Multiple hits returned. Lawson arrested Jackson and transported him to a county jail.

In booking Jackson at the jail, Lawson again ran Jackson's identifying information through the databases and confirmed Jackson had several outstanding warrants. At issue here is a warrant

for flagrant non-support of a child issued by a Grant County, Kentucky court for a "James A. Jackson." The underlying documents supporting the warrant identify that person as having at least the same birth year and last four social security numbers as plaintiff. Other than the name and birth year, the warrant itself provides few details: it lists a height of 5'7", an address of "4720 Cynthiana" (with no city or state), race as "unknown," and has no entries for gender, weight, or operator license number.

Lawson testified that he told Jackson about the warrant, to which Jackson responded that "he didn't think it was him." Surprisingly, Jackson's own evidence on this crucial point is less than helpful. Jackson testified that he first learned of the outstanding warrant two years prior following a different arrest. He wrote a letter to "some lawyer" listed at the bottom of that warrant saying they had "the wrong person" and did nothing else. As for Lawson, Jackson did not recall Lawson presenting him with information about the Grant County warrant, and did not identify any instances in which he protested his innocence to Lawson. Nevertheless, because Jackson contested the warrant (at least when viewing the facts in the light most favorable to Jackson), Lawson "went through . . . steps" to reverify that the flagrant non-support warrant matched Jackson (namely his date of birth), and ultimately served it. He did so despite perceiving Jackson as being "a little bit taller" (Jackson says he is 6'1") and noting Jackson gave him a different street address.

Jackson remained in Jefferson County's custody until December 28, 2015, at which time his drug-related and other Jefferson County warrants were resolved. It is at this time, according to Jackson's testimony, that he learned about the flagrant non-support warrant (because he was going to be transferred to Grant County's custody instead of released). He then protested—at least to his attorney—about the Grant County warrant. Jackson remained in Grant County's custody until he was able to post bond on February 24, 2016 (after which he remained on house arrest).

Following a court-ordered DNA test that excluded plaintiff as the biological father subject to the flagrant non-support warrant, a Grant County judge dismissed that charge on March 15, 2016.

Plaintiff commenced this civil rights action thereafter, asserting numerous claims against a variety of defendants. In response to the defendants' various motions to dismiss, the district court permitted only three of plaintiff's individual capacity claims against Lawson to proceed to discovery—§ 1983 false arrest/wrongful detention, § 1983 equal protection, and false imprisonment under Kentucky law—and dismissed the remaining claims and defendants. After discovery, Lawson sought and obtained summary judgment in his favor on the remaining claims. Plaintiff appeals.

## II.

We review the district court's grant of summary judgment de novo. *Rogers v. O'Donnell*, 737 F.3d 1026, 1030 (6th Cir. 2013). Summary judgment is proper when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Although we view the evidence in a light most favorable to the nonmovant, *Rogers*, 737 F.3d at 1030, "the plain language of Rule 56[] mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## III.

In limited circumstances, we have recognized that "someone who is wrongly imprisoned as a result of mistaken identity can state a constitutional claim against his jailers based on their failure to ascertain that they had the wrong man." *Gray v. Cuyahoga Cty. Sheriff's Dep't*, 150 F.3d 579, 582 (6th Cir. 1998), *opinion amended on denial of reh'g*, 160 F.3d 276 (6th Cir. 1998).

The sole issue on appeal is whether the district court erred in granting summary judgment in Lawson's favor on Jackson's claim that Lawson wrongfully detained him when he served the flagrant non-support warrant despite evidence allegedly suggesting Jackson was "the wrong man."[1] We find no such error.

The general rule is that when an individual is arrested pursuant to a facially valid warrant and detained despite protestations of mistaken identity, the individual's imprisonment is not constitutionally repugnant. *See, e.g.*, *Baker v. McCollan*, 443 U.S. 137, 144 (1979). However, "mere detention pursuant to a valid warrant but in the face of repeated protests of innocence will after the lapse of a certain amount of time deprive the accused of liberty without due process of law." *Id.* at 145 (internal quotation marks and ellipsis omitted). We have subsequently elaborated that in these situations, a plaintiff must show that a government official "act[s] with something akin to deliberate indifference in failing to ascertain that the [person] they had in custody was not the person wanted . . . on the outstanding . . . warrant." *Gray*, 150 F.3d at 583. Three factors generally inform the analysis: (1) the detention's length of time; (2) the extent to which the plaintiff protested his innocence; and (3) the availability of exculpatory evidence to the government official at the time of the detention. *Id.* at 582–83; *see also Seales v. City of Detroit*, 724 F. App'x 356, 362 (6th Cir. 2018). Based upon the totality of the circumstances, we cannot say Lawson acted so recklessly to rise to the level of deliberate indifference under our caselaw.

*Length of time*. This factor weighs in Jackson's favor. The fifty-eight days Jackson spent in detention—not counting the twenty more on house arrest—rises to a sufficient number of days

---

[1]Because Jackson does not appeal the district court's other dismissals, he has forfeited our review of those claims. *See United States v. Johnson*, 440 F.3d 832, 845–46 (6th Cir. 2006).

violative of due process. *See, e.g.*, *Gray*, 150 F.3d at 582 (finding forty-one days sufficient to deprive a defendant of due process).

*Protestations of innocence.* This factor cuts against Jackson. "[R]epeated protests of innocence" are typical of wrongful detention claims, *Baker*, 443 U.S. at 144, and our cases reinforce this. *Compare Thurmond v. Cty. of Wayne*, 447 F. App'x 643, 649–50 (6th Cir. 2011) (summary judgment was proper when the plaintiff produced no evidence that the defendant officers "were ever made aware of even a single claim of innocence . . . , let alone repeated protestations"), *with Seales*, 724 F. App'x at 364 (summary judgment was not proper where the plaintiff "protested his innocence . . . numerous times"). Such a standard, moreover, makes sense; contrary to plaintiff's suggestions, a single comment about innocence does not by itself lead to constitutional liability. *See, e.g.*, *Flemister v. City of Detroit*, 358 F. App'x 616, 621 (6th Cir. 2009) (Sutton, J., concurring) ("More often than not, the police take someone into custody after a stop of the individual (for, say, a speeding violation) and after the police then learn of an outstanding arrest warrant in the individual's name. At that point, one can understand why the police might give short shrift to a suspect's protestations of innocence."). At best, Jackson raised his innocence once in passing to Lawson, saying only that "he didn't think it was him." This equivocal statement falls well short of "repeated protests of innocence."

*Availability of exculpatory evidence.* This last factor examines whether a detaining officer failed to conduct a "reasonable inquiry" in light of evidence suggesting he was detaining the wrong person, *Gray*, 150 F.3d at 583, and also weighs against Jackson. *Gray* and *Seales* are two good examples of such deliberately indifferent conduct. In both cases, police officers had the ability to compare the physical appearance of the plaintiffs with those individuals actually sought by the respective arrest warrants. In *Gray*, police had both a photograph of the suspect that "bore virtually

no resemblance" to the plaintiff and a physical description of "certain permanent scars" on the suspect that the plaintiff did not have. 150 F.3d at 582–83. Similarly, the police in *Seales* had: (1) a mugshot that "look[ed] nothing" like the plaintiff; (2) the suspect's fingerprints available to them; and (3) an arrest warrant for the suspect that presumably did not match the plaintiff due to date of birth and address differences. 724 F. App'x at 364. And in neither case did the police do anything with this powerful evidence favoring the detained plaintiffs. *Gray*, 150 F.3d at 583; *Seales*, 724 F. App'x at 364.

The record here reflects no such exculpatory evidence or indifferent conduct. Jackson has not identified—nor could we locate—any evidence in Lawson's possession that would suggest Jackson was not the individual sought by the Grant County warrant. Indeed, as the district court observed, "the record shows . . . that Jackson was the person sought under the warrant." If he wasn't, there of course would have been no need for him to eventually seek and obtain an order from the Grant County Circuit Court dismissing the charges against him, which he did after obtaining the conclusive exculpatory evidence after the fact—a negative paternity test.[2]

True, the warrant contained some information that did not completely line up with Jackson—namely a six-inch difference in height and a different address. On this basis, Jackson contends our malicious prosecution decision in *Webb v. United States*, 789 F.3d 647 (6th Cir. 2015), is instructive because there too we noted a six-inch height difference between the plaintiff and the suspect. *Id.* at 661–62. We are not convinced. Unlike here, *Webb* dealt with many material differences. *Id.* at 662 ("The evidence suggests that there was ample room for variation in height, build, facial features, and tattoo patterns between [the suspect] and [the plaintiff] that would have

---

[2]Lawson suggested below that a clerical error by individuals in Grant County resulted in the issuance of the arrest warrant for the wrong James Jackson. Whether Grant County properly issued the warrant in the first instance is a different matter and not one before us.

been apparent at close proximity in broad daylight. Therefore, it remains a genuine issue of material fact whether [the suspect] looked like [the plaintiff].").[3]

In light of the information known to Lawson at the time and Jackson's fleeting protestation, we agree with the district court that the differences (and omissions) on the arrest warrant did not rise to the level sufficient to qualify as exculpatory evidence mandating further reasonable inquiry. Moreover, we are hesitant to conclude Lawson was deliberately indifferent here because he did take at least one step to verify Jackson's identity in response to Jackson's single and generic claim of innocence to Lawson. *Cf. Baker*, 443 U.S. at 145–46 ("[W]e do not think a sheriff executing an arrest warrant is required by the Constitution to investigate independently every claim of innocence . . . . Nor is the official charged with maintaining custody of the accused named in the warrant required by the Constitution to perform an error-free investigation of such a claim.").

IV.

For these reasons, we affirm the district court's judgment.

---

[3]We find plaintiff's several out-of-circuit authorities similarly unpersuasive and factually distinguishable. *See, e.g.*, *Garcia v. Cty. of Riverside*, 817 F.3d 635 (9th Cir. 2016); *Gant v. Cty. of Los Angeles*, 772 F.3d 608 (9th Cir. 2014); *Cannon v. Macon Cty.*, 1 F.3d 1558 (11th Cir. 1993), *opinion amended on denial of reh'g*, 15 F.3d 1022 (11th Cir. 1994).